## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 31 2020, 6:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bryan L. Ciyou
Ciyou & Dixon, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Dane A. Mize
Skiles DeTrude
Indianapolis, Indiana

### IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Nexgen Mold & Tool, Inc., <br> *Appellant-Defendant,* <br><br> v. <br><br> Precise Tooling Solutions, Inc., <br> *Appellee-Plaintiff.* | January 31, 2020 <br><br> Court of Appeals Case No. 19A-CT-1369 <br><br> Appeal from the Bartholomew Superior Court <br><br> The Honorable Kathleen Tighe Coriden, Judge <br><br> Trial Court Cause No. 03D02-1804-CT-2183 |

**Friedlander, Senior Judge.**

[1]     Nexgen Mold & Tool, Inc., appeals the trial court's entry of judgment in favor of Precise Tooling Solutions, Inc.  On cross-appeal, Precise requests an award of appellate attorney's fees.  We affirm and remand.

[2]     Precise is an Indiana-based company that manufactures tools, also known as molds, for the plastic injection molding industry. Nexgen is an Indiana-based company that also manufactures tools.

[3]     Nexgen was contracted to redesign and build a tool that would be used to manufacture a portion of an automobile's dashboard. Nexgen was too busy to do the work in-house, so it contacted Precise and provided plans for the tool. On July 24, 2017, Precise sent Quote Number 5444 to Nexgen. In the quote, Precise stated it would "design and make new core and cavity inserts and cavity subs . . . fit to existing tool," for $65,450. Tr. Vol. 3, p. 5 (Ex. 1).

[4]     On July 26, 2017, Nexgen sent Purchase Order 13251 to Precise. Nexgen agreed to Precise's quoted price, to be paid "30% Down, 60% @1st Smple [sic], 10% @Apprvl [sic]." Tr. Vol. 3, p. 6 (Ex. 2). The "first sample" is the initial version of the tool. Tr. Vol. 2, p. 10. Don Dumoulin, Precise's owner, explained that in the plastic injection molding industry, the first sample is "very rarely" the final, correct version of the tool. *Id.* To the contrary, it is common for the customer to identify defects in the tool through testing, and the manufacturer works with the customer to produce "maturation[s]," or "trial[s]," of the part until it is finally approved for use in mass manufacturing. *Id.* at 10, 15.

[5]     The purchase order set forth a "Promise Date" of September 13, 2017. Tr. Vol. 3, p. 6. Nexgen paid the down payment to Precise per the terms of the order,

and Precise sent the first sample of the tool to Nexgen on September 13, 2017. Tr. Vol. 2, p. 14.

[6] On September 14, 2017, Scott Nickerson, an employee of Precise, sent Kevin Gancher, an employee of Nexgen, an email asking if the tool was satisfactory. Gancher indicated the tool had defects and possibly some damage. Nickerson responded, "Let us know what we can do." Tr. Vol. 3, p. 9 (Ex. 5). Next, Gancher emailed Nickerson images of some of the defects. Precise picked up the tool and made corrections.

[7] On September 26, 2017, Precise sent Nexgen a second trial of the tool. Three days later, Gancher sent Nickerson an email detailing defects in the revised copy. Precise picked up the tool and performed additional work.

[8] Meanwhile, on September 27, Precise sent Nexgen an invoice for 60% of the agreed-upon price for delivery of the first sample. On October 3, 2017, a Nexgen employee emailed Tiffanny Laker, Precise's office manager, to request a current statement of what Nexgen owed Precise. Laker sent the employee a statement indicating that Nexgen owed $39,270.00.

[9] On October 13, 2017, Precise sent to Nexgen a third trial of the tool. In an October 19, 2017 email, Gancher told Nickerson he had consulted with the customer and identified additional defects. Precise retrieved the tool and attempted to address the issues identified by Nexgen.

[10]     On October 30, Precise sent Nexgen a fourth trial of the tool.  On November 6, 2017, Gancher emailed Nickerson to identify a different defect and to ask Precise "to pick up the tool to repair this area."  Tr. Vol. 3, p. 31 (Ex. 12). Precise picked up the tool and performed additional work.

[11]     On November 21, 2017, Precise sent Nexgen a fifth trial of the tool.  Also on that day, Laker emailed Gancher a final invoice for the tool and asked when Precise could expect payment for the "60% invoice."  Tr. Vol. 3, p. 40 (Ex. 15). Gancher acknowledged receipt of the fifth trial and indicated it would be submitted to final testing to see if it was satisfactory.  He asked Laker to resubmit the final invoice on December 1, 2017, when the testing should be complete.  Gancher did not discuss the prior invoice.  Later that day, Laker emailed Gancher to indicate the final invoice would be resubmitted on December 1.  She again asked him for information about payment for Precise's prior invoice, and he did not respond.  Neither Gancher nor any other Nexgen employee contacted Precise to discuss the test results for the fifth trial or to identify any uncorrected or newly-discovered defects.

[12]     In the meantime, on September 28, 2017, Precise and Nexgen had entered into a separate agreement under Quote Number 5663 and Purchase Order 13311, pursuant to which Precise agreed to produce another tool for Nexgen at a cost of $4,233.00.

[13]     On January 12, 2018, Don Dumoulin, Precise's owner, emailed John Lukes, Nexgen's owner, to request payment of Precise's pending invoices.  Lukes

indicated he was out of the office and would respond soon. On February 1, 2018, Dumoulin emailed Lukes again, noting payment was "[n]ow 90+ days overdue." Tr. Vol. 3, p. 46 (Ex. 17). Lukes and Dumoulin scheduled a meeting, but Lukes canceled it two hours before the meeting was scheduled to begin.

[14] On February 5, 2018, Nexgen notified Precise to stop work on the project under Purchase Order 13311. Precise had already begun to manufacture the tool and asked Nexgen to pay $3,950.00 for the work that had been done. Nexgen did not provide payment.

[15] Dumoulin continued to contact Lukes to request payment, but Nexgen did not follow through. When Dumoulin threatened a lawsuit over the unpaid invoices, Lukes responded that Nexgen was experiencing "a cash crunch" and was unable to pay Precise because Nexgen had not yet been paid for the job either. Tr. Vol. 3, p. 61 (Ex. 22). In a February 28, 2018 email to Lukes, Dumoulin apologized for the delay and promised payment in the next two weeks. Other than the thirty percent down payment, Nexgen did not pay Precise any funds owed under Purchase Order 13251, and Nexgen never paid Precise any money for Precise's work under Purchase Order 13311.

[16] On April 19, 2018, Precise filed a complaint against Nexgen, alleging two counts of breach of contract (one for each purchase order) and one count of unjust enrichment. Nexgen filed an answer denying Precise's allegations. The parties attended mediation but failed to reach a settlement.

[17] On April 26, 2019, the trial judge presided over a bench trial. Next, the parties filed proposed findings of fact and conclusions thereon. May 16, 2019, the court issued findings of fact and conclusions thereon, and issued a judgment in favor of Precise on both of its claims of breach of contract. The court rejected as moot Precise's claim of unjust enrichment. The court ordered Nexgen to pay Precise $63,668.18, which included prejudgment interest, plus attorney's fees. The court ordered Precise to submit an affidavit of attorney's fees.

[18] Precise filed an affidavit of attorney's fees, and Nexgen filed a response. On June 12, 2019, the court awarded attorney's fees to Precise in the amount of $11,113.76. This appeal followed.

[19] The trial court issued findings of fact and conclusions thereon at Nexgen's request.[1] "On appeal of claims tried by the court . . . , the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A).

[20] A panel of this court has explained that, pursuant to Trial Rule 52(A), we apply a two-tiered review of a trial court's findings and conclusions: "first, we consider whether the evidence supports the findings; second, we determine whether those findings support the trial court's judgment." *Kishpaugh v.*

---

[1] We thank the trial court for its detailed findings and conclusions, which greatly assisted the Court in addressing the issues on appeal.

*Odegard*, 17 N.E.3d 363, 370 (Ind. Ct. App. 2014). The trial court's findings and judgment will be set aside only if they are clearly erroneous. *Shelby's Landing-II, Inc. v. PNC Multifamily Capital Inst. Fund XXVI Ltd. P'ship*, 65 N.E.3d 1103 (Ind. Ct. App. 2016).

[21] Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *Mullis v. Brennan*, 716 N.E.2d 58 (Ind. Ct. App. 1999). A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *In re Estate of Johnson*, 855 N.E.2d 686 (Ind. Ct. App. 2006), *trans. denied*. We neither reweigh the evidence nor assess the credibility of witnesses but consider only the evidence most favorable to the judgment.[2] *Id.*

[22] The essential elements of a breach of contract claim are the existence of a contract, the defendant's violation of the terms of the contract, and damages. *Fowler v. Campbell*, 612 N.E.2d 596 (Ind. Ct. App. 1993). The parties agree that they had a binding contract based on Quote Number 5444 and Purchase Order 13251.[3] Further, Nexgen does not dispute that it failed to pay Precise the full amount owed under the contract. Nexgen instead argues that Precise breached

---

[2] The Statement of Facts in Nexgen's Appellant's Brief fails to set forth the evidence most favorable to the judgment, which hindered our review of the case.

[3] Nexgen does not raise any issue on appeal regarding breach of the parties' separate contract under Quote Number 5663 and Purchase Order 13311, so we need not address that portion of the trial court's judgment. We also need not address the question of unjust enrichment.

the contract first by failing to timely deliver a tool that met the contractual requirements.

[23] The record does not support Nexgen's argument as to timeliness. Purchase Order 13251 included a "Promise Date" of September 13, 2017. Tr. Vol. 3, p. 6 (Ex. 2). On September 13, 2017, Precise sent the first sample of the tool to Nexgen. As noted, in the plastic injection molding industry it is "very common" for a manufacturer to deliver the first sample of a tool and then produce additional trials of the tool as defects are revealed during testing. Tr. Vol. 2, p. 15. This business practice explains why the Purchase Order called for Nexgen to provide an installment payment upon delivery of the first sample and then again upon final approval of the tool. In addition, the record contains a lengthy exchange of emails by Gancher and Nickerson as they discussed different trials of the tool. Neither Gancher nor any other Nexgen employee complained that the tool was late or that Precise had missed the contractual deadline, even after Precise made repeated demands for payment.

[24] Further, neither Gancher nor any other Nexgen employee ever told Precise that the dashboard manufacturer had penalized Nexgen for untimely delivery of the tool or otherwise complained. To the contrary, Lukes, in his emails to Dumoulin, complained about payment delays by the customer rather than any pressure from the customer for an alleged untimely delivery. This evidence supports the trial court's determination that Precise met the deadline by timely delivering the first sample.

[25]   In addition, the evidence supports the trial court's conclusion that the tool complied with contractual requirements. After Precise delivered the first sample on September 13, 2017, Precise submitted four additional trials of the tool to correct defects identified by Nexgen, which is a common practice in the industry. Nexgen never objected to the process or the overall quality of the work, and never threatened to stop working with Precise. Instead, upon receiving the fourth trial of the tool in November 2017, Nexgen asked Precise to pick up the tool and fix it, indicating a willingness to continue the project. After receiving the fifth trial of the tool, Gancher indicated the tool would be submitted for final testing and suggested Precise could submit its final invoice on December 1, 2017. Nexgen never communicated the test results to Precise or indicated that the fifth trial was defective.

[26]   Similarly, during Dumoulin and Lukes' email exchanges in January and February 2018 about Nexgen's delinquent payments, Lukes never criticized the quality of the tool or the manufacturing process. Lukes instead blamed nonpayment on a cash flow problem and promised to pay Precise for its work. A reasonable person could have concluded from Nexgen's lack of complaints about the fifth trial, and Lukes' unqualified promise to pay, that the fifth trial met Nexgen's requirements. As a result, there is evidence to support the trial court's conclusions that Precise met its commitments under Purchase Order 13251, and Nexgen breached its commitments by failing to pay.

[27]   Nexgen points to other evidence to argue that the promise date of September 13, 2017, was actually the date Precise should have delivered the final, defect-

free version of the tool. Nexgen further cites other evidence to argue that Precise's tool never met the contractual requirements and that Nexgen ultimately had to finish the work itself, incurring additional costs in the process. These arguments are requests to reweigh the evidence, which our standard of review forbids. *See Ind. & Mich. Elec. Co. v. Terre Haute Indus., Inc.*, 507 N.E.2d 588 (Ind. Ct. App. 1987) (affirming judgment for plaintiff in breach of contract case; parties presented conflicting evidence as to who had breached the contract, but the evidence favorable to the trial court's judgment was sufficient to sustain the findings and conclusions), *trans. denied*.

[28] Next, Nexgen claims that Precise violated an express warranty that the tool would meet Nexgen's requirements and further claims that Precise was not entitled to attorney's fees at trial. These claims are based on Nexgen's argument that Precise breached the contract first, and the evidence as found by the trial court, with ample support in the record, does not support that argument. We need not address the claims further. *See Snellenbarger v. Kunz*, 798 N.E.2d 523, 528 (Ind. Ct. App. 2003) (rejecting appellant's argument that trial court should not have awarded certain damages; argument was based on "assumption that [appellant] was not in breach," but evidence supported trial court's contrary determination on breach of contract), *trans. denied*.

[29] On cross-appeal, Precise claims it is entitled to an award of appellate attorney's fees pursuant to the contract. Quote Number 5444 provided that if the customer "fails to make any payment(s) in accordance with this Proposal, [Precise] shall be entitled to recover its reasonable attorneys' fees and costs . . .

incurred for any claim or lawsuit . . . ." Tr. Vol. 3, p. 5 (Ex. 1). This provision, and an identical provision in Quote Number 5663, was the basis for the trial court's award of attorney's fees.

[30] When a contract provides that attorney's fees are recoverable, appellate attorney's fees may also be awarded. *Cavallo v. Allied Physicians of Michiana, LLC*, 42 N.E.3d 995 (Ind. Ct. App. 2015). Precise, as the prevailing party on appeal, is entitled to appellate attorney's fees.

[31] For the reasons stated above, we affirm the judgment of the trial court and remand for a calculation of appellate attorney's fees to be awarded to Precise.

[32] Judgment affirmed and remanded.

Riley, J., and Pyle, J., concur.